1  KENNETH W. DONNELLY (LEAD TRIAL ATTORNEY) FILED
2  (D.C. Bar No. 462996)
   donnellyk@sec.gov
3  SCOTT W. FRIESTAD (New York Bar No. 2292183)
   friestads@sec.gov
4  NINA B. FINSTON (D.C. Bar No. 431825)
   finstonn@sec.gov
5  DREW D. PANAHI (Cal. Bar No. 224352)
   panahid@sec.gov
6
7  Attorneys for the Plaintiff
   SECURITIES AND EXCHANGE COMMISSION
8  100 F Street, N.E.
   Washington, DC 20549-5949
9  Telephone: (202) 551-4946 (Donnelly)
   Facsimile: (202) 772-9292 (Donnelly)
10

11                   UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14
                                                        JCS
15 SECURITIES AND EXCHANGE COMMISSION,    | Case No. CV

16              Plaintiff,                  CV 13 2549

17         v.
                                           COMPLAINT
18 BRUCE W. TOMLINSON,

19              Defendant.

20

21 Plaintiff Securities and Exchange Commission (the "Commission") alleges:

22                   **SUMMARY OF THE ACTION**

23        1.      This case involves insider trading in the securities of InterMune, Inc.

24 ("InterMune"), a publicly traded pharmaceutical company based in Brisbane, California, in

25 advance of a December 17, 2010 announcement that the European Medicines Agency's

26 ("EMA") Committee for Medicinal Products for Human Use ("CHMP") had recommended that

27 a European Union ("EU") commission approve InterMune's Marketing Authorization

28 Application ("MAA") for marketing its drug, Esbriet, in the EU. By mid-November 2010, in the

1  course of his employment, InterMune's Principal Accounting Officer, Vice President of Finance,

2  and Controller, Bruce W. Tomlinson ("Defendant" or "Tomlinson"), had become privy to

3  material non-public information about the increasing probability that the CHMP would render a

4  positive opinion and faster than had been publicly anticipated by the company. Tomlinson

5  tipped his friend and former business associate, Michael Sarkesian ("Sarkesian"), that, amongst

6  other things, the European regulatory review process appeared "to be moving faster and better"

7  than anticipated and that this impacted on "Company wide strategic decisions." In advance of

8  the December 17, 2010 announcement, Sarkesian directed the purchase of 400 out-of-the-money

9  InterMune call options which resulted in imputed profits of $616,000.

10        2.        By engaging in the conduct described in this Complaint, Tomlinson violated

11  Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and

12  Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Tomlinson should be enjoined from further

13  violations under Exchange Act Section 21(d)(1) [15 U.S.C. § 78u(d)(1)], ordered to pay civil

14  monetary penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1], and prohibited in

15  the future pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)] from acting as an

16  officer or director of any issuer that has a class of securities registered pursuant to Section 12 of

17  the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of

18  the Exchange Act [15 U.S.C. § 78o(d)].

19                        **JURISDICTION, VENUE, AND INTRADISTRICT ASSIGMENT**

20        3.        The Commission brings this action pursuant to Sections 21(d), 21(e), and 21A of

21  the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78u-1], over which this Court has subject

22  matter jurisdiction pursuant to Sections 21(d), 21(e), 21A and 27 of the Exchange Act [15 U.S.C.

23  §§ 78u(d), 78u(e), 78u-1 and 78aa]. In connection with the conduct described herein, Defendant

24  directly or indirectly made use of the means or instrumentalities of interstate commerce, or of the

25  mails, or the facilities of a national securities exchange.

26        4.        Venue in this District is proper pursuant to Section 27 of the Exchange Act [15

27  U.S.C. § 78aa] because, among other things, an act or transaction constituting the violations of

28

1   law alleged in this Complaint occurred within the Northern District of California, Defendant

2   transacts business in this District, and Defendant inhabits and is found in this District.

3         5.      Under Civil Local Rule 3-2, this civil action should be assigned to the San

4   Francisco Division. A substantial part of the events which give rise to the claim occurred in San

5   Mateo County, where InterMune is headquartered and Defendant was employed by InterMune.

6                              **DEFENDANT**

7         6.      **Bruce W. Tomlinson**, age 53, is a resident of Los Altos, California. At all

8   relevant times, he was the Principal Accounting Officer, Vice President of Finance, and

9   Controller of InterMune. He has been licensed as a certified public accountant in California

10   since 1988. That license is currently inactive. Prior to joining InterMune, Tomlinson worked as

11   an audit partner of a major audit firm and was the Chief Financial Officer for the European

12   operations of a New York Stock Exchange-listed company. In June 2012, he became a vice

13   president and CFO of a NASDAQ-listed company, a position he held until resigning in

14   November 2012.

15              **OTHER RELEVANT PERSONS AND ENTITIES**

16         7.      **Michael Sarkesian**, age 53, is a citizen and resident of Switzerland.

17         8.      **Quorne Limited** is a British Virgin Islands limited liability company whose only

18   shareholder is a Cyprus trust maintained for the benefit of Sarkesian's wife.

19         9.      **InterMune, Inc.**, a Delaware corporation headquartered in Brisbane, California,

20   is a pharmaceutical company focused on developing and commercializing therapies in

21   pulmonology and hepatology. InterMune's common stock is registered with the Commission

22   under Exchange Act Section 12(b) [15 U.S.C. § 78l(b)] and trades on The NASDAQ Stock

23   Market. During the relevant period, options in the common stock of InterMune traded on the

24   Chicago Board Options Exchange, the Philadelphia Stock Exchange, the Boston Stock

25   Exchange, the International Securities Exchange, the American Stock Exchange, and the New

26   York Stock Exchange's Arca System.

27

28

1                             **FACTUAL ALLEGATIONS**

2     **A.  Background**

3        10.    In March 2010, InterMune submitted an MAA to the EMA seeking regulatory

4 approval from the EU to market InterMune's development drug Esbriet for the treatment of

5 patients with idiopathic pulmonary fibrosis ("IPF").  In 2010 during the pendency of InterMune's

6 application to the EMA, there were no medicines or other effective treatments approved in

7 Europe for IPF's treatment.

8        11.    The EMA is responsible for the evaluation and supervision of human medicines

9 developed for use in the EU.  Subcommittees, composed of representatives from EU countries,

10 conduct the bulk of its scientific and evaluative work.  The CHMP is the subcommittee which

11 vets MAAs pertaining to drugs for human use.

12        12.    On receiving an MAA, the CHMP appoints two of its members -- the so-called

13 Rapporteur and co-Rapporteur -- to assess it.  The Rapporteur and co-Rapporteur issue questions

14 and comments in prescribed formats at established intervals following receipt of the MAA, and

15 ultimately present their findings and recommendation to the CHMP membership for a vote.   The

16 usual time frame for presenting a recommendation is approximately 210 days following receipt

17 of the MAA, excluding the applicant's response times to inquiries.  In rare instances when there

18 are no significant issues, the CHMP can render a decision in as few as 180 days following receipt

19 of an MAA, again excluding the applicant's response time to inquiries.  The schedule of CHMP

20 meetings, although not the specific matters under consideration, is posted on the CHMP's

21 website.  Once the CHMP issues an opinion on a medicine, it is forwarded to the EU commission

22 for ratification, which as of 2010 had always been granted in the case of new drug applications,

23 after which the medicine is marketable throughout the EU.

24        13.    Following the submission of its MAA in March 2010, InterMune maintained in its

25 public statements up through as late as October 28, 2010 that it anticipated a CHMP decision in

26 the first half of 2011, consistent with a 210-day vetting period.

27        14.    InterMune personnel involved in marshaling the MAA through the regulatory

28 process regarded the Rapporteur and Co-Rapporteur's communications and questions posed from

1  June through September 2010 as being far more positive and presenting issues of a far lesser
2  magnitude than management had anticipated.

3     15.    Encouraged by the overall positive tone of the communications, InterMune
4  pursued strategic planning which it made sense to pursue only if the CHMP were to render a
5  positive opinion. The strategic planning related to, among other things, (1) the migration of the
6  intellectual property ("IP") associated with the prospective use of Esbriet in the EU from the
7  United States to an EU member state with a lower effective tax rate; (2) the exploration of the
8  feasibility of selling the company; and (3) budgeting for and staffing the European operations.
9  InterMune retained outside consultants to assist on the first two matters.

10     16.    On November 15, 2010, an EMA employee who acted as a liaison between the
11  Rapporteur and co-Rapporteur and a third outside consultant to InterMune advising on the MAA
12  process emailed the latter to exhort InterMune to be mindful of deadlines going forward because
13  "most probably Esbriet will go for a positive Opinion" at the CHMP's December 2010 meeting,
14  which was scheduled for December 13 through 16, 2010.

15     17.    A flurry of communications back and forth between InterMune scientific
16  personnel, InterMune's outside consultant, and the two EMA liaisons ensued. A second EMA
17  employee who also acted as liaison sent emails on November 16 and 17, 2010 in which he
18  confirmed the substance of the first email explaining that the "trend is positive" and that there
19  were "no major issues" remaining with respect to InterMune's application.

20     18.    InterMune scientific personnel kept an InterMune senior executive ("Senior
21  Executive") apprised of the EMA-liaison communications.

22     19.    Although issues subsequently arose that threatened to postpone the timing, by
23  December 6, 2010 the EMA liaison had assured InterMune that the Rapporteur and co-
24  Rapporteur would be recommending at the CHMP's December 2010 meeting that the MAA be
25  approved.

26     20.    On Friday, December 17, InterMune announced that the CHMP had rendered a
27  positive opinion, causing InterMune's stock and options prices to soar. In trading volume 58
28

1    times the 30-day average, InterMune's common stock jumped from $14.27 to $35.81. The

2    options series held by Quorne rose to $18.20 per underlying share.

3        **B.    Tomlinson's Awareness of Material Non-Public Information**

4        21.    Having viewed the CHMP website and communicated with his InterMune

5    colleagues, Tomlinson was aware generally in 2010 of the CHMP's process for vetting an MAA.

6        22.    Tomlinson knew at the time that EU marketing approval was critical to

7    InterMune's survival and drove its strategic planning throughout the summer and fall of 2010.

8        23.    It was as a result of Tomlinson's direct involvement in certain aspects of strategic

9    planning that Tomlinson gleaned that regulatory review of the MAA was going faster and better

10    than anticipated. Specifically, he was tasked with heading InterMune's efforts on the IP

11    migration and was involved in budgeting for and staffing of the European operations. He was

12    also aware by November 5, 2010 that the company was exploring the feasibility of selling itself

13    in the event of a positive CHMP opinion, and that the tax benefits to be achieved through an IP

14    migration would make the company a more attractive acquisition target.

15        24.    InterMune consistently declined to publicly comment on the tone and substance

16    of communications with the CHMP or to provide full details relating to the budgeting for and

17    staffing of the European operations. It did not publicly disclose its exploration of a sale of the

18    company.

19        25.    By November 2010, Tomlinson had either been apprised of or procured

20    information pertaining to certain of the Rapporteur's and co-Rapporteur's prior communications

21    with the company and the company's responses.

22        26.    The November 15-17, 2010 communications from the EMA liaisons detailed

23    above in Paragraphs 16-17 prompted further contemporaneous communications with Tomlinson

24    from which he understood at least by November 17, 2010 that the regulatory approval process

25    was going faster and better than anticipated.

26        27.    In response, Tomlinson, who understood that the IP migration only made sense if

27    the CHMP rendered a positive opinion, ramped up the IP migration process.

28

28.     On or before November 18, 2010, Tomlinson informed the outside consultant working on the IP migration project that the InterMune Senior Executive had additional insights and thoughts based on very recent developments with the EU authorities which would need to be factored into the IP valuation.

29.     At a subsequent meeting with the outside consultant and Tomlinson on November 22, 2010, the InterMune Senior Executive did not elaborate on the very recent developments but did indicate that the probability of regulatory approval factored into the IP valuation model should be increased from 50% to a range of 60-75%, with his best guess being 60%.

30.     In addition to information Tomlinson gleaned from his involvement in the IP migration process, he gleaned information from the process of budgeting and staffing European operations. For example, by November 11, 2010, Tomlinson had seen the 2011 budget recommendation for European operations, which assumed EU marketing approval, and which InterMune's CEO subsequently approved on November 21, 2010.

31.     Reflective of his awareness of a growing positive momentum, at a meeting with the InterMune Senior Executive and another senior executive on November 18, 2010, Tomlinson broached spending 50% of his time in Europe performing CFO functions. After consulting with the head of European operations, on November 22, 2010, the two senior executives agreed to Tomlinson's proposal.

32.     Tomlinson knew that he was subject to restrictions on his use and dissemination of material nonpublic information which he obtained in the course of his employment.

C.      **Tomlinson Tipped Sarkesian**

33.     By November 2010, Tomlinson had had a longstanding correspondence with Sarkesian about InterMune, its prospects, including EU marketing approval, and stock performance. During 2010, Tomlinson and Sarkesian communicated about InterMune's efforts to obtain marketing authorization in the EU.

34.     In email communications to Sarkesian on November 17 and 22, 2010, Tomlinson communicated material nonpublic information concerning the progress of the European MAA review process and its impact on InterMune's strategic planning. Specifically, on November 17,

Complaint

1  2010, Tomlinson emailed Sarkesian that, "Things are starting to move fast around here," adding,

2  "[t]here is only so much I can say, particularly in writing. The European process seems to be

3  moving faster and better than expected, which leads to other Company wide strategic decisions"

4  in which Tomlinson indicated he was involved. As part of a continuing chain of email

5  exchanges, on November 22, Tomlinson told Sarkesian that InterMune's CEO had directed him,

6  in Tomlinson's capacity as CFO of European operations, to spend 50% of his time in Europe

7  because "Europe needs immediate help . . . ."

8  **D.  Sarkesian Directs Quorne's Purchase of Options**

9  35.  On November 24, 2010, Sarkesian initiated communications with Quorne's

10  broker dealer that continued over the next two weeks about trading in InterMune securities.

11  36.  On December 7 and 8, 2010, Sarkesian directed Quorne's broker to purchase 400

12  out-of-the-money contracts of call options on InterMune stock based on information about

13  InterMune that he obtained from Tomlinson. The options had a strike price of $20 and a July

14  2011 expiration date. Quorne bought 50 options on December 7 and 350 more options on

15  December 8, paying $2.80 per each of the 100 common shares underlying each options contract,

16  for a total cost of $112,000. The trades took place on exchanges in the United States.

17  37.  The value of the options soared on the December 17, 2010 news that the CHMP

18  had rendered a positive opinion resulting in imputed profits of $616,000.

19  **FIRST CLAIM FOR RELIEF**

20  *Violations of Section 10(b) of the Exchange Act and Rule 10b-5*

21  38.  Paragraphs 1 through 37 above are re-alleged and incorporated by reference.

22  39.  Tomlinson knew, or was reckless in not knowing, that the information he gained

23  in the course of his employment and communicated to Sarkesian was material and nonpublic,

24  and that in tipping Sarkesian he breached his fiduciary duty to the shareholders of InterMune and

25  for an improper purpose.

26  40.  Tomlinson received, or expected to receive, a personal benefit in tipping

27  Sarkesian.

28

8                                                              Complaint

1      41.    By engaging in the conduct described above, Tomlinson, directly or indirectly, in

2   connection with the purchase or sale of a security, by use of means or instrumentalities of

3   interstate commerce, of the mails, or of a facility of a national securities exchange, with scienter:

4   (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material

5   fact or omitted to state material facts necessary in order to make the statements made, in the light

6   of the circumstances under which they were made, not misleading; or (c) engaged in acts,

7   practices or courses of business which operated or would have operated as a fraud or deceit upon

8   persons, thereby violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-

9   5 thereunder [17 C.F.R. § 240.10b-5].

10      42.    Based on his conduct, including as described above, unless restrained and

11  enjoined, Tomlinson will continue to violate Section 10(b) of the Exchange Act and Rule 10b-5.

12                        **PRAYER FOR RELIEF**

13      WHEREFORE, the Commission respectfully requests that this Court:

14                               **I.**

15      Permanently enjoin Defendant pursuant to Section 21(d)(1) of the Exchange Act [[15

16  U.S.C. § 78u(d)(1)] from directly or indirectly violating Section 10(b) of the Exchange Act [15

17  U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

18                             **II.**

19      Order Defendant to pay civil penalties pursuant to Section 21A of the Exchange Act [15

20  U.S.C. § 78u-l];

21                             **III.**

22      Prohibit Defendant pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §

23  78u(d)(2)] from acting as an officer or director of any issuer that has a class of securities

24  registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file

25  reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

26

27

28

1

**IV.**

2    Grant such other relief as this Court may deem just and appropriate.

3

4    Dated: June 6, 2013                     Respectfully submitted,

5

6

7                                           KENNETH W. DONNELLY
                                            Attorney for Plaintiff
8                                           SECURITIES AND EXCHANGE COMMISSION

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint